**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **Augustyn Kasprzyk** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:17-cv-08523** |
| | ) | |
| **Axiom Financial LLC, formerly known as,** | ) | |
| **Axiom Financial Services;** | ) | |
| **Accredited Home Lenders, Inc.;** | ) | |
| **Accredited Mortgage Loan REIT Trust;** | ) | |
| **LSF5 Accredited Investments, LLC;** | ) | |
| **Lone Star Fund V, L.P.;** | ) | |
| **American Home Mortgage Servicing, Inc.;** | ) | |
| **Homeward Residential Holdings, Inc.,** | ) | |
| **formerly known as AHMSI Holdings, Inc.;** | ) | |
| **Ocwen Loan Servicing, LLC;** | ) | |
| **Ocwen Financial Corporation;** | ) | |
| **Citi Property Holdings Inc., formerly** | ) | |
| **known as Liquidation Properties, Inc.;** | ) | |
| **Citigroup, Inc.;** | ) | |
| **Gregory Funding LLC;** | ) | |
| **Ditech Financial LLC, formerly known as,** | ) | |
| **Green Tree Servicing, LLC;** | ) | |
| **Aspen Shackleton III LLC;** | ) | |
| **Regions Mortgage, Inc.;** | ) | |
| **Regions Financial Corporation;** | ) | |
| **Deutsche Bank National Trust Company;** | ) | |
| **Deutsche Bank Holdings, Inc.;** | ) | |
| **Deutsche Bank Trust Corporation;** | ) | |
| **U.S. Bank Trust National Association; and** | ) | |
| **Credit Suisse International** | ) | |
| **Defendants.** | ) | |

---

**AMENDED COMPLAINT**

NOW COMES Plaintiff Augustyn Kasprzyk ("Plaintiff" and "Kasprzyk"), by and through his

attorneys of Rubenstein Business Law, stating as follows:

<u>INTRODUCTION</u>

1.   This Complaint is commenced by Plaintiff for redress against the named Defendants.

2.   This Complaint is filed against the named Defendants for their violation of the Racketeer

     Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq*.

3.   Plaintiff seeks monetary damages for the Defendants violation of the RICO conspiracy

     provision pursuant to 18 U.S.C. § 1962(c) and (d) ("Counts I & II"), Illinois Consumer

     Fraud and Deceptive Business Practices Act ("ICFA") 815 ILCS 505/2 *et. seq*, (Count III);

     Civil Conspiracy (Count IV), Intentional Infliction of Emotional Distress ("Count V"),

     Trespass ("Count VI"), FDCPA ("Count VII"), and RESPA ("Count VIII").

<u>JURISDICTION</u>

4.   This Court has jurisdiction to grant the relief sought by the Plaintiffs pursuant to 28

     U.S.C. §§ 1331, 1334, 15 U.S.C. § 1640 *et seq.*, and 12 U.S.C. §§2602, 2607 and 27

     U.S.C. 1964.

5.   The Court has supplemental jurisdiction over the Plaintiffs state law claims pursuant to

     28 U.S.C. § 1367.

6.   Venue is proper pursuant to 28 U.S.C. §§1391(b), 1394, 1395(a), 1408(l), 1409, and

     1411, where the real estate interest of Plaintiff is located at 4151 N. Keeler, Chicago,

     Illinois (the Property) is the subject of this proceeding and the Property is situated in this

     District. Venue lies in this District pursuant to the provisions of 28 U.S.C. § 1391(b) and

     18 U.S.C. § 1965(a) in that Defendants have transacted business of a substantial and

     continuous character in this District, Defendants are subject to personal jurisdiction in

     this District, and a substantial part of the events or omissions giving rise to these claims

occurred in this District. Additionally, the ends of justice require that Defendants be brought before the Court pursuant to 18 U.S.C. § 1965(b).

7.    This Court has jurisdiction over the named Defendants for the causes of action asserted herein arise from and is connected to the named Defendants transaction of business in this State.

<u>PARTIES</u>

8.    Plaintiff is a natural person residing in the state of Illinois within this Court's jurisdiction.

9.    Defendant Axiom Financial Services (Axiom), a surrendered California is now Axiom Financial, LLC whose corporate office is located at 9350 South 150 East, Suite 140, Sandy, Utah 84070. Axiom's registered agent for service of process is CT Corporation System, 136 East South Temple, Suite 2100, Salk Lake City, Utah 84111. Axiom is a subsidiary of PHH Corporation.

10.    Defendant Accredited Mortgage Loan Trust 2007-1 (the Trust) is located at 11000 Broken Land Parkway, Columbia, Maryland 21044 is a Delaware Trust.

11.    Defendant Accredited Home Lenders, Inc. (Accredited), was a California corporation located at 16550 West Bernardo Drive, Bldg 1, San Diego CA 92127. Accredited was dissolved in 2012. Its agent for service of process is James K. Ransom, 9915 Mira Mesa Boulevard, Suite 120, San Diego California 92131.

12.    Accredited is wholly owned by Accredited Home Lenders Holding Co. (Accredited Holdings) which was a Delaware corporation whose corporate headquarters were located at 15090 Avenue of Science, San Diego, California 92128. Accredited Holdings was dissolved in bankruptcy in 2011.

13.    Prior to its dissolution, Accredited Holdings merged with LSF5 Accredited Investments, LLC (Accredited LSF5), a subsidiary of Lone Star Fund V, L.P. (Lone Star), in 2007.

14.    Defendant Accredited Mortgage Loan REIT Trust (Accredited REIT) is a Maryland real estate investment trust and is an indirect subsidiary of Accredited and Accredited Holdings, which are now Lone Star.

15.    Defendants Accredited LSF5 and Lone Star are headquartered at 2711 North Haskell Avenue, Suite 1700, Dallas Texas 75204.

16.    Defendant Accredited Holdings also operated under the names Axiom and Home Funds Direct. Accredited, Accredited Holdings, Accredited REIT, Axiom, Accredited LSF5, and Loan Star and may be collectively referred to herein as "Accredited".

17.    Defendant Deutsche Bank National Trust Company (Deutsche Bank), formerly Bankers Trust Company of California from 1986 – 2002, is a California corporation whose corporate office is located at 300 South Grand Avenue, 41st Floor, Los Angeles, California 90071. Deutsche Bank is a subsidiary of Deutsche Bank Holdings, Inc.

18.    Defendant Deutsche Bank Holdings, Inc. (DB Holdings), formerly known as Bankers Trust Holdings, Inc., operates as a subsidiary of Deutsche Bank Trust Corporation.

19.    Defendants Deutsche Bank Trust Corporation (DBTC) and DB Holdings' U. S. headquarters is located at 60 Wall Street, 40th Floor, New York, New York 10005-2836. Their local location is 222 South Riverside Plaza, Riverside Plaza, Chicago Illinois 60606.

20.    Defendant Credit Suisse International (Credit Suisse) is a multinational investment banking entity headquartered at 5 Cabot Square, London, E14 4QR, United Kingdom.

Credit Suisse local office is located at 227 W. Monroe Street, Chicago Illinois 60606. Credit Suisse is the swap and cap provider under the Trust.

21. Defendant Liquidation Properties, Inc. (Liquidation), corporate office is located at 390 Greenwich Street, New York, New York 10013. Liquidation's parent company is Citigroup, Inc. (Citigroup).

22. Defendant Citi Property Holdings Inc. (Citi), formerly known as Liquidation, whose parent company is Defendant Citigroup, in which both Citi and Citigroup's corporate office is located at 388 Greenwich Street, New York, New York 10013.

23. Defendant U.S. Bank Trust National Association corporate headquarters is located at 800 Nicollet Mall, Minneapolis, Minnesota 55402.

24. Defendant Gregory Funding LLC (Gregory), a portfolio lender and loan servicer, corporate headquarters is located at 9400 South West Beaverton-Hillsdale Highway, Suite 131-A, Beaverton, Oregon 97005. Great Ajax Corp. is Gregory's parent company.

25. Defendant Ditech Financial LLC (Ditech), formerly known as Green Tree Servicing LLC, a mortgage lender and servicer, corporate headquarters is located at 1100 Virginia Drive, Suite 100A, Fort Washington, Pennsylvania 19034.

26. Defendant Aspen Shackleton III LLC (Aspen), corporate headquarters is located at 9400 South West Beaverton-Hillsdale Highway, Suite 131, Beaverton, Oregon 97005. Great Ajax Corp. is Aspen's parent company, who is also located at 9400 South West Beaverton-Hillsdale Highway, Suite 131, Beaverton, Oregon 97005.

27. Defendant Regions Mortgage, Inc. (RMI), a subsidiary of Regions Bank, is located at 5420 Highway 280, Birmingham Alabama 35242. RMI is a division of Regions Bank and

a subsidiary of Regions Financial Corporation (RFC). Defendant RFC corporate headquarters is located at 1900 Fifth Avenue North, Birmingham, Alabama 35203.

28. Defendants RMI, Regions Bank, and RFC were servicers of the Loan and are collectively referred to herein as "Regions".

29. Defendant Homeward Residential Holdings, Inc. (Homeward), formerly known as AHMSI Holdings, Inc., a Texas corporation, is a wholly owned subsidiary of Ocwen Financial with its principal place of business located at 1525 S. Belt Line Road, Coppell, Texas 75019-4913.

30. Defendant American Home Mortgage Servicing, Inc. (AHMSI) is a Delaware corporation and wholly owned subsidiary of Ocwen, with its corporate headquarters located at 1525 South Beltline Road, Coppell, Texas. AHMSI was also the parent company of AHMSI Holdings, Inc.

31. Defendant Ocwen Loan Servicing, LLC (Ocwen) is a Florida entity and a financial institution with its principal place of business located at 1661 Worthington Road, Suite 100, West Palm Beach, Florida 33146. Defendant Ocwen's Illinois registered agent is Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

32. Defendant Ocwen Financial Corporation (Ocwen Financial) is the umbrella corporation for Ocwen, NMLS# 1852; Ocwen Mortgage Servicing, Inc., NMLS# 1089752; and Homeward Residential, Inc., NMLS# 3984. Ocwen Financial headquarters is in West Palm Beach, Florida.

33. Ocwen Technology Xchange, Inc. (OTX) is a subsidiary of Ocwen Financial.

34. Defendant RMI began its relationship with Ocwen Financial, through OTX in 2002.

<u>FACTUAL ALLEGATIONS</u>

***<u>Facts related to securitization</u>***

1.    Securitization is the pooling together of mortgage loans into one financial investment instrument known as a Mortgage Backed Security (MBS). The pooling together of residential MSBs are known as residential mortgage backed securities (RMBS).

2.    MBS's and RMBS's are issued based upon the income stream anticipated and generated by monthly mortgage payments from pooled mortgages and are then sold to investors through certificates. The investors are certificate holders.

3.    The certificates are referred to as mortgage pass-through certificates because the cash flow from the pool of mortgages are passed through to the certificate holders when the borrowers make payments on the pooled mortgage loans.

4.    These pooled mortgage loans are held in a trust for the benefit of the investors.

5.    The illustration below illustrates the securitization process:



Source: WSJ Reporting

    a)  **Borrower**: gets financing to purchase a home or refinance a loan.

    b)  **Broker**: gets fees for doing the preliminary sales and paperwork.

    c)  **Lender**: gets up front fees for making the loan. The lender may be forced to take back the loan.

   d) **Investment Bank**: collects fees for packaging the loans into bond deals. The investment banker may also try to force the lender to take back the loan in case of default or otherwise be forced to eat any losses.

   e) **Investors**: earn interest on the bonds and absorb any gains or losses. The investors may have legal recourse against the bank if they can show the quality of the bonds were misrepresented. Hundreds of investors have filed suit against lenders.

6.    The broad framework of all mortgage trust typically includes the following entities:

   a) **Issuing Entity**, which is the trust.

   b) **Depositor**, which is the party responsible for transferring assets, the mortgage loans, into the trust by indorsing and assigning the loans to the trust.

   c) **Sponsor, Originator, or Servicer**, which is the party responsible for selling all rights and interest in the mortgage loans to the Depositor for depositing the mortgage loans into a trust. It also has the administrative duty of handling the mortgage loans in the trust which involves a number of task, including but not limited to, collecting mortgage loan payments from borrowers, distributing payments to trust certificate holders, administrating escrow accounts, providing required notices to borrowers, handling all verbal and written communications with the borrower, and other duties as set forth in the Truth In Lending Act (TILA) and the Real Estate Settlement and Procedures Act (RESPA).

   d) **Master Servicer, Trust Administrator, or Custodian**, which is the party responsible for all duties described above in (c) and in supervising other servicers.

   e) **Trustee** which is the party only in name who represents the trust and has a fiduciary duty to the trust certificate holders.

7.    The Sponsor or Originator is responsible for selling mortgage loans to the Depositor.

8.    The final step in placing assets into the trusts is to convey the mortgage loans into the trust.

9.    When mortgage loan payments are collected by the Servicer, those payments are to be distributed to the trust beneficiaries, called certificate holders in the trust.

10. The Servicer is responsible for ensuring its servicing practices are in conformance with those of prudent mortgage lending institutions that service similar mortgage loans.

11. The Master Servicer has servicing agreements with other servicers, for those other servicers, Sub-Servicers, to service the mortgage loans that are in the trust.

12. The fundamental value of the certificates held by the certificate holders is based upon the ability of borrowers to repay the mortgage loans as well as the value of the collateral for those loans.

13. For this reason, the representation of the quality of the loans and value of the collateral is critically important.

14. In securitization markets, basic standards were ignored. Instead mortgage originators and lenders abandoned underwriting standards, allowed pervasive and systematic exceptions to their underwriting standards without proper justification, outside of greed; adopted practices that significantly varied from the norm and their stated underwriting practices; disregarded credit risk; disregarded quality control in favor of generating loan volume which increased their profits at the detriment of the borrowers and the investors; pressured and at times even coerced appraisers to inflate the value of the underlying collateral; and engaged in predatory lending practices; all for purpose of making more money at any expense.

15. This was a fundamental shift in the securitization markets.

16. This shift proved to be highly profitable in the short term for the mortgage originators. By shifting to securitization and selling of mortgages to investors, the originators shifted the loans off their books so their financial position looked better in paper, earned immediate upfront fees which encouraged originators to issue more loans, regardless of loan quality.

17.     This shift also allowed originators to earn significant loan servicing fees which further created an unchecked incentive to originate more loans, regardless of loan quality.

18.     This created a flawed compensation practices that permeated Wall Street financial markets led by greed as has been discovered by numerous reports and testimony. Sheila C. Bair, Chair of the FDIC in her testimony before the FDIC.[1]

### *Facts related to the Servicers Handling & Treatment of Securitized Mortgage Trusts*

19.     Accredited established securitized mortgage trusts for selling RMBS to investors. Accredited sponsored each trust, and originated and serviced the mortgage loans contained in each trust.

20.     Accredited was one of this country's top subprime lenders.

21.     In its fiscal year of 2006, Accredited originated nearly $12 billion in subprime mortgage loans.

22.     Accredited originated subprime loans and sold them in the secondary market through RMBS securitizations or whole loan pool sales which are sales of an entire pool of subprime mortgage loans to a single purchaser.

23.     Accredited funded its mortgage originations using credit lines, commonly referred to as Warehouse Lines which are provided by financial firms commonly referred to as Warehouse Lenders.

24.     Warehouse Lines are short-term revolving credit facilities that Accredited used to originate new subprime mortgages.

---

[1] Attorney General of Massachusetts Report, *The American Dream Shattered: The Dream of Home Ownership and the Reality of Predatory Lending*. SEC v. Mozilo, et al., No. 09-3994 (C.D. Cal.), Declaration of Paris Wynn.

25. When Accredited sold the mortgages, it originated in a RMBS securitization or a whole loan pool sale, it used the proceeds to pay down the balances on its Warehouse Lines.

26. Accredited received more money for its mortgages by engaging in RMBS securitizations rather than whole loan pool sales.

27. The RMBS securitizations were an integral and substantive part of Accredited's business.

28. The Warehouse Lenders also acted as loan underwriters for Accredited's RMBS securitizations, including the securitizations of the Trusts.

29. Accredited's RMBS were debt obligations that represented claims to the cash flows from pools of residential mortgage loans. When securitizing a pool of subprime mortgages, Accredited utilized a series of wholly owned subsidiaries and trusts. First Accredited, through its subsidiaries, sold the loans into a trust. That trust then issued RMBS that represented claims on the principal and/or interest payments made by borrowers on the loans in the pool. A RMBS investor's risk and return were functions of the tranche, or class of RMBS within the trust *(e.g.,* senior/mezzanine/subordinated), that the RMBS investor purchased. Each tranche had its own credit rating

30. In connection with each of the trusts, Accredited and its subsidiaries execute Mortgage Loan Purchase Agreements (MLPA) which are required to close the trust, and which memorialized both the terms of the sale of the mortgage pool for securitization and the representations and warranties governing the loans. In the MLPA, which were referenced in the prospectuses SEC Forms 8K that an Accredited subsidiary filed with the SEC on behalf of each trust, Accredited represented that it did not have any reason or cause to believe that it could not perform the covenants set forth in the MLPAs. The MLPAs provided that Accredited shall repurchase or replace those mortgage loans collateralizing

the trusts for which there were breaches of a representation or warranty that materially and adversely affected the value of the loans or the RMBS investors' interest in the loans.

31.    In 2006 Accredited Holdings maintained Warehouse Lines provided by IXIS, HSBC, GMAC, Morgan Stanley, Goldman Sachs, Lehman Brothers, Merrill Lynch, and Credit Suisse.

32.    Accredited's subprime market began to decline in 2005. Prior to 2005, Accredited originations increased from $1.517 billion in 2000 to $12.422 billion in 2004.

33.    In 2006 – 2007, Accredited shares fell from $58.45 to $3.97.

34.    On June 4, 2007 Accredited sold its mortgage loans to Lone Star.

### *Facts related to the Accredited Mortgage Loan Trust 2007-1*

35.    Pursuant to public documents filed with the Securities and Exchange Commission (SEC), which this Court may take notice and the Plaintiffs request that this Court takes judicial notice, on June 1, 2007 the Accredited Mortgage Loan Trust 2007-1 (the Trust) was established pursuant to the Trust Perspective and Trust Pooling and Servicing Agreement (Trust Documents). See Exhibit 'A' as attached herein.

36.    Pursuant to the Trust Documents US Bank is the Owner Trustee and Deutsche Bank is the Indenture Trustee (collectively referred to herein as "the Trustees"). Id. at § 1.01.

37.    Accredited REIT is the Depositor of the Trust, the party responsible for transferring the Loan into the Trust. Id. at § 1.01.

38.    Accredited is the Master Servicer and the Originator, through Axiom, of the Trust. Id. at § 1.01.

39.    The Trust is the Issuing Entity in which US Bank conducts the business of the Trust. Id. at § 2.01.

40. Accredited established the Trust for selling RMBS to investors. Accredited sponsored, originated, and serviced Trust.

41. The Trust cut-off date for mortgage loans being accepted into the Trust was January 1, 2007. Id, § 1.01.

42. The Trust closing date was January 30, 2007. Id.

43. The Depositor is the only party that can transfer and assign mortgage loans into the Trust to the Trustee and such transfers of mortgages must contain indorsements evidencing the full chain of title. Id. at § 2.01.

44. The Depositor received its interest in mortgage loans from the ***Mortgage Loan Purchase Agreement*** (Purchase Agreement).

45. The Trust is a Real Estate Mortgage Investment Conduit (REMIC) pursuant to the Internal Revenue Code (IRC) and is governed by and subject to the laws of the state of Delaware. Id. at § 1.01, and 2.09.

46. As such the Trust's authority is limited by the REMIC provisions of the IRC.

47. The Trust itself is a mortgage securitization trusts in which the Trust securitized classes of mortgages and sold them to investors. Id

48. Accredited services and administers the loans in the Trust. Id. at § 3.01.

49. Accredited enters agreements with Servicer, also referred to as Sub-Servicers. Id. at § 3.

50. Pursuant to the Trust Documents, the Trust does not have any directors, officers, or other employees. Instead, all parties acted through and at the direction Accredited and the Servicers.

51. The Trust Lead Manager was Lehman Brothers Inc.

52.     The Trust Co-Managers are Banc of America Securities LLC, Bear Stearns & Co. Inc., and HSBC Securities (USA) Inc.

## *Facts Related to the Plaintiffs' Mortgage Loans*

53.     On or around July 27, 2006 Plaintiff secured an adjustable rate mortgage loan through Axiom (Loan) in the amount of $764,800. See Exhibit 'B' as attached herein.

54.     At said time a $191,200 loan was also secured against the Property, through Axiom.

55.     Plaintiff began making payments on the Loan through Accredited.

56.     The Servicers were operating under the guidance and supervision of the Master Servicer, Accredited. Therefore, any reference to the Servicers - AHMSI, Accredited Mortgage, Ocwen, Homeward, Regions, AHMSI, Gregory, and Ditech) shall also include the Master Servicer, Accredited.

57.     Per the PSA, when the Servicers collected mortgage loan payments from Plaintiff, the Master Servicer purportedly transferred those payments to each trust beneficiaries, the Certificateholders.

58.     Therefore, the Trust is primarily administered by the Servicers.

59.     On January 23, 2007 Mortgage Electronic Registration Systems, Inc. (MERS), as nominee for Axiom, assigned the Loan to Accredited (Assignment I). See Exhibit 'C' as attached herein.

60.     On January 2, 2009 MERS, as nominee for Accredited, assigned the Loan to Liquidation (Assignment II). See Exhibit 'D' as attached herein. This same assignment occurs again on January 21, 2009 with execution by different parties (Assignment III). See Exhibit 'E' as attached herein.

61.     At some additional point in time, Accredited assigned to Liquidation (Assignment IV).

62.    Assignments I and IV were later corrected. See Exhibit 'F' as attached herein.

63.    On June 23, 2009 AHMSI recorded a lost assignment affidavit.

64.    On April 27, 2011 Citi assigned to Aspen Shackleton III LLC (Assignment V). See Exhibit 'G' as attached herein.

65.    Citi was fined $28.8 million by the Consumer Financial Protection Bureau (CFPB) for its runaround tactics of struggling borrowers.

66.    Most recently the Loan is being serviced by Gregory and by Ditech.

67.    Though never disclosed to Plaintiff by Axiom, the Loan was in the Trust. See Exhibit 'H' as attached herein.

68.    As such, based upon the assumption that Accredited sold and deposited the Loan into the Trust pursuant to the terms of the PSA, making it a viable loan, the Servicers accepted Plaintiff's payments on the Loan to make payments to the Trust.

69.    In 2015 Aspen commenced a foreclosure action against Plaintiff and has since such time sold the Property at the foreclosure sale.


***Facts Related to the Duties of the Servicers of the Trust***

70.    Accredited and Homeward were the initial Servicers of the Loan.

71.    Accredited is the Master Servicer of the Loan and the Trust.

72.    Homeward is a wholly owned subsidiary of Ocwen.

73.    Axiom and Accredited were in the business of originating, sponsoring, selling, and servicing subprime mortgage loans.

74.    During this time, Axiom and Accredited established securitized mortgage trusts for selling RMBS to investors. Accredited sponsored each trust, and originated and serviced the mortgage loans contained in each trust, including the Trust.

75.     As with most securitized mortgage trusts, in which the Trust herein is no different, the PSA provides the last step in the mortgage conveyance process is the Depositor's, here Accredited, conveyance or sale of the mortgage loans to the Trust for the benefit of the Trust Certificate holders.

76.     Here, Accredited as the Depositor, Axiom and Accredited as the Originator, Accredited as the Master Servicer, and Homeward and Ocwen as Servicers and Sub-Servicers, had a duty to ensure that its mortgage servicing practices, which include collection procedures of mortgage loan payments, were in conformance with those of prudent mortgage lending institutions which service similar mortgage loans.

77.     Accredited, as the Master Servicer, also had a duty to monitor the Sub-Servicers and to use reasonable and good faith efforts to cause the Sub-Servicers to perform their duties and obligations dully and punctually.

78.     Accredited and US Bank were also responsible for administration of the Trust, which includes but is not limited to, pool performance calculations, the preparation and distribution of month distribution reports, preparation and filing of REMIC tax returns on behalf of the Trust REMICs or other legal entities formed pursuant to the PSA, preparation of Form 10-D reports, Form 8-K reports, and Form 10-K annual reports in which all such reports are to be filed with the SEC on behalf of the Trust.

79.     Therefore, Accredited has engaged in the business of securities administration for all publicly offered mortgage backed certificates issued by the Depositor.

80.     Homeward and Ocwen as Servicers have also engaged in the business of securities administration as administrators and servicers of the Trust, as well as Regions, Gregory, and Ditech.

81.     Liquidation, Citi, and Aspen, as successors in interest to Accredited have also engaged in the business of securities administration as administrators and servicers of the Trust.

***Facts Related to Robo-Signing***

82.     Defendant Ocwen, through other parties, namely ASMSI, Accredited, and Homeward, serviced the Loan. See Exhibit 'J' as attached herein.

83.     Ocwen has been found to engage in robo-signing.

84.     Robo-signing is the common practice of the execution of assignments of mortgages and other mortgage related conveyance documents in an assembly line fashion without investigating the allegations and information made in the documents that the affiant attest to, though affiant attest that the information alleged is in affiant's personal knowledge.

85.     In October 2010, after numerous complaints of robo-signing and the widespread use of robosigned affidavits in foreclosure proceedings throughout foreclosure proceedings in this country, attorney generals of states around the country formed a coalition and partnered with the federal government to investigate the robo-signing phenomena.

86.     According to the Congressional Oversight Panel's November Oversight Report, Affidavits such as the ones involved in the foreclosure irregularities are statements made under oath and thus clearly fall within the scope of the perjury statutes.

87.     Due to their findings of unsafe and unsound practices in mortgage servicing and foreclosure proceedings, the above-mentioned parties entered various consent decrees with mortgage lenders and servicers who were found to violate these practices.

88.     Defendant Ocwen was one of the many servicers who were found to violate these practices.

89.     The CFPB found that Ocwen engaged in the following practices:

    a.    prepared, executed, notarized, and presented false and misleading documents, filing false and misleading documents with courts and government agencies, or otherwise using false or misleading documents as part of the foreclosure process (including, but not limited to, affidavits, declarations, certifications, substitutions of trustees, and assignments); and

    b.    prepared, executed, notarized, and filed affidavits in foreclosure proceedings, whose affiants lacked personal knowledge of the assertions in the affidavits and did not review any information or documentation to verify the assertions in such affidavits.

90.    Pursuant to these violations, in the year 2012 Ocwen entered a consent decree with the Consumer Financial Protection Bureau (CFPB) which eventually led to a $2.1 billion robo-signing settlement agreement with the CFPB.

91.    Ocwen has also been found to mass produce assignments and other mortgage documents with total disregard for the accuracy of the information and notarization formalities in which the signing individuals and notaries hold dozens of different job titles as needed to fulfill false documents for foreclosing.

92.    In addition to robo-signing, government investigations prompted by robo-signing violations, revealed other wide spread servicing abuses and poor practices and misconduct by servicers of RMBS, including Ocwen and its affiliates.

### *Facts related to the Plaintiffs RICO Counts*

93.    The Defendants collectively conspired to defraud Plaintiff to make money, using the Trust which affects interstate commerce.

94.    The enterprise has existed since July 2007, when the Trust was purportedly created.

95.     To do so the Defendants operated an enterprise for the investment and acquisition of mortgage loans into trust by creating MBS and RMBS.

96.     In the course of its interstate business, the named Defendants regularly extended or offered to extend consumer credit for which a finance charge is imposed to create a mortgage pool, known as trusts, taking the real estate as collateral, and operating the collateral of the Trust by servicing the loans.

97.     A mortgage pool is an enterprise.

98.     The Defendants created a scheme to defraud the Plaintiffs which leveraged risk wherein the money used to fund the scheme was not the borrowers monthly mortgage payments on the loans in the Trust, but rather were the purchases of various RMBS that really were not backed by anything.

99.     The Defendants carried out this scheme both in the origination of the Loan and the creation and administration of the Trust, all with the main purpose of making money for the Defendants, at the detriment of Plaintiff and the Trust certificate holders.

100.    The structure of the scheme is set as follows:

    a.  Accredited, through Axiom, solicited Plaintiff to secure the Loan.

    b.  Plaintiff submitted his financial information with proof of income and assets to process the Loan.

    c.  Though Axiom is listed as the lender on the closing documents, it was not the lender. Instead the investors of trusts were the lender.

    d.  Accredited, who plays the role of the Servicer, Master Servicer, Originator, and Seller purportedly sells the Loan II to itself who then in turn sells the Loan to the Trust. Accredited was paid for this service.

101.    All the Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity, including the scheme to defraud Plaintiff of the Property, which successfully occurred.

102.    For the purpose of executing and attempting to execute this scheme, the Defendants, in violation of 18 U.S.C. 1341, placed or caused to be placed in the post offices and/or other authorized repositories, delivered by commercial interstate carrier, and received matter and things from the postal service or commercial and interstate carriers, including but not limited to refinance solicitations, loan applications and other documents to secure and close on the Loan, and falsified, fraudulent, and defective documents to create the Loan, create the Trust, and to foreclose on the Property.

103.    These practices could not have occurred without the use of the U.S. Mail and various wires including telephones and the internet.

104.    In the trust scheme, none of the Defendants were the borrower, broker, lender, investment banker or investor. Therefore, none of the Defendants had any liability as it relates to the Loan or any of the loans in the Trust.

105.    The origination closing documents reflect the incorrect creditor and fail to disclose the true creditor and the true fees and profits of all parties identified with the transaction. Therefore, the closing documents — note, mortgage and settlement statements are fatally defective and are fraudulently created to make money by deceiving the borrowers and investors of the Trust.

106.    The activities described in the preceding paragraph were affairs conducted collectively by the Defendants for making money and securing assets.

107.    Here it makes perfect sense for the Defendants to be a part of the enterprise because all

they did was profit and suffered no losses.

CLAIMS

<strong>COUNT I</strong><br>
<em>RICO Violation – 18 U.S.C. 1962(c)</em><br>
<em>Against All Defendants</em>

108.    Plaintiff re-states and incorporates the following sections herein: Introduction,

Jurisdiction, Parties, and Factual Allegations.

109.    Racketeering activity includes any act relating to mail fraud and wire fraud. 18 U.S.C.

1341 and 1343 respectively.

110.    Defendants have engaged in a pattern of racketeering activity using wire and mail by the:

a) creation and origination of the Loan and 2;) servicing of the Loan II in violation of 18

U.S.C. 1962(c).

111.    This pattern of racketeering began with the Loan and when government agencies

provided evidence and cited the parties for their unfair and deceptive acts in the

origination and servicing of mortgage loans, as well as their foreclosure practices.

112.    Plaintiff was not alerted of the Defendants racketeering until August 31, 2017 until a Forensic

Report by CFLA revealed this unlawful conduct to the Plaintiff.

113.    In violation of 1341 and 1343 the Defendants placed or caused to be placed in post

offices and/or in other authorized repositories matters and things to be sent or delivered

by the postal servicer and commercial interstate carriers, and received matter and things

from the postal servicer and other interstate carriers, misleading, deceptive, and defective

documents.

114. The practices described herein could not have occurred with the use of the postal service and other interstate carriers, as wells as with the use of wires, including telephone wires, facsimiles, and the use the internet.

115. The Defendants are persons. 18 U.S.C. 1961(3).

116. The Servicers are responsible for operating and managing the business affairs of the enterprise.

117. Accredited as the Master Servicer also directed all Servicers to impose and collect improper fees and assist in filing false mortgage papers to effectuate foreclosure.

118. Accredited authorized Axiom to collect Plaintiff's documents to submit to Accredited to underwrite and fund the Loan.

119. These activities describe the way the Defendants collectively conducted affairs of the enterprise.

120. The Defendants constitute an enterprise engaged in and whose activities affect interstate commerce.

121. The Defendants are enterprises within the RICO Act because they are either an individual, partnership, corporation, association, or other legal entity as set forth in the Act. 1961(3).

122. The enterprise, at the very least, has existed since the preparation for the creation of the Trust back in the year 2006, six months before the Trust was official.

123. Accredited, with the assistance of the Defendants, created a scheme to defraud Plaintiff by leveraging risk wherein the money used to fund the scheme was not Plaintiff or any of the borrower's monthly mortgage payments, but instead the scheme was funded by purchases of alleged RMBS.

124. Axiom and Accredited carried out this scheme not only in the origination the Loan, but in the administration of the Trust.

125. The scheme operated as follows: Plaintiff gathered all required financial documentation to submit for approval of the Loan. Axiom approved the Loan and paid a fee to Accredited and Lehman for closing on the Loan in the name of Axiom. However, considering Plaintiff's financial position, Plaintiff did not qualify for two loans and Axiom already knew this from the financial documentation Plaintiff submitted for the Loan. Though Plaintiff did not technically qualify for the Loan, Axiom and Accredited approved the Loan by hiking the value of the Property to justify the Loan.

126. The sponsor and originator purportedly sold the Loan to Accredited REIT as the Depositor, who in turn sold the Loan to Trust. Accredited and the Servicers get paid a fee for the service it provided. Accredited, as the master servicer proceeds as if the Loan complies with the PSA. For every payment that Plaintiff make on the Loan, the Servicers receive a fee, both the servicer who directly administers the Loan as well as the Master Servicer. However, Accredited already anticipating Plaintiff would default on the Loan, takes out an insurance policy on the Loan in the event of default on the Loan.

127. A foreclosure action commences upon the Property. However, the Defendants, pursuant to their RICO scheme, were already paid from the default insurance proceeds.

128. Plaintiff have been injured by the loss of all investments into the Property including but not limited to mortgage payments of interest and principal, fees, insurance, taxes, etc.; as well as attorneys' fees and costs as well as the looming loss of the Property.

129. Plaintiff was the intended target of the Defendants conduct.

**WHEREFORE**, Plaintiff respectfully pray this Honorable Court award him actual damages; statutory damages; treble damages; punitive damages; and reasonable attorney fees and cost of suit.

### COUNT II
### *RICO Violation – 18 U.S.C. 1962(d)*
### *Against All Defendants*

130. Plaintiff re-states and incorporates the following sections herein: Introduction, Jurisdiction, Parties, and Factual Allegations.

131. Defendants conspired to originate the Loan, knowing it was bound to default and lead to foreclosure and created false documents to execute the Loan and foreclose, in violation of 18 U.S.C. 1962(d). Specifically, the Assignments that were created after 2007 were false and the Defendants knew them to be false because the Plaintiff's loan was transferred to the Trust in 2007. The Note was lost in 2011 – yet the Defendants continued to manufacture Assignments and transfers of loans that they did not own or control.

132. Plaintiff was not alerted of the Defendants' unlawful conduct until August 31, 2017 when a Forensic Report by CFLA revealed this unlawful conduct to the Plaintiff.

133. The Defendants conspired with Servicers and Sub-Servicers to use the enterprise to enrich themselves and foreclose upon the Property. The Defendants intentionally conspired and agreed to conduct and participate in the affairs of the enterprise through the racketeering activity in violation of 18 U.S.C. 1962(c) and (d).

134. The Defendants are therefore liable to Plaintiff for their RICO violations.

**WHEREFORE**, Plaintiff respectfully pray this Honorable Court award him actual damages, statutory damages, treble damages, punitive damages and reasonable attorney fees and cost of suit.

### COUNT III
### *Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA)*
### *Against All Defendants*

135. Plaintiff re-states and incorporates the following sections herein: Introduction, Jurisdiction, Parties, and Factual Allegations.

136. The Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA) prohibit fraudulent, deception, misrepresentation, concealment, and suppression of any material fact during the conduct of trade or commerce. 810 ILCS 505/1-505/12.

137. The ICFA is the Illinois Unfair and Deceptive Acts and Practices (UDAP) statute.

138. Unfair or deceptive acts and practices, including but not limited to, deception, fraud, false pretense, false promise, and misrepresentation, of any material fact with the intent that others rely upon the deception of such material fact is unlawful regardless of whether any person has in fact been misled, deceived, or damaged thereby. Id.

139. Banking and credit activities are included in the course of conduct of trade or commerce for purposes of the Illinois UDAP statute.

140. The Defendants violated 815 ILCS 505/2 by engaging in unfair acts and practices to collect a superseded debt. Specifically, the Defendants represented that they owned and controlled Plaintiff's loan even though the loan was transferred to the Trust in 2007. Upon every alleged transfer, the Defendants tried to collect payments on Plaintiff's loan and represent to the Plaintiff that the Defendants were the party to whom the debt was owed, even though the Promissory Note was lost and the Defendants lacked evidence to support their representation. The Defendants' representations were false and they knew them to be false in the hope that Plaintiff would rely upon them to Plaintiff's detriment.

141. This activity, promulgated by the enterprise, lead to the looming foreclosure of the Property. Plaintiff was not alerted of the Defendants' racketeering until August 31, 2017 when a Forensic Report by CFLA revealed this unlawful conduct to the Plaintiff.

142. This caused substantial damage to Plaintiff through the fight to save the Property, the

looming loss of the Property, loss of available credit, decreased health, and severe emotional distress.

143.    The deceptive practices occurred during the course of trade or commerce, securing a refinance mortgage on the Property and the administration and servicing of the Loan.

144.    Defendants are liable to Plaintiff for actual damages, punitive damages, attorney fees, and litigation costs. 815 ILCS 505/10a.

**WHEREFORE**, Plaintiff respectfully pray this Honorable Court award him actual damages, punitive damages, and reasonable attorney fees and cost of suit.

**COUNT IV**
***Civil Conspiracy***
*Against All Defendants*

145.    Plaintiff re-states and incorporates the following sections herein: Jurisdiction, Parties, and Factual Allegations.

146.    The Defendants conspired to arrange and produce the Loan knowing the Loan did not comply with the underwriting guidelines of the Trust, and knowing the Loan would default. Specifically, the Defendants represented that they owned and controlled Plaintiff's loan even though the loan was transferred to the Trust in 2007. Upon every alleged transfer, the Defendants tried to collect payments on Plaintiff's loan and represent to the Plaintiff that the Defendants were the party to whom the debt was owed, even though the Promissory Note was lost and the Defendants lacked evidence to support their representation. The Defendants' representations were false and they knew them to be false in the hope that Plaintiff would rely upon them to Plaintiff's detriment. Defendants then continued the conspiracy by pushing for foreclose upon the Property.

147.    Plaintiff was not alerted of the Defendants' unlawful conduct until August 31, 2017 when a Forensic Report by CFLA revealed this unlawful conduct to the Plaintiff. The conspiracy occurred

for profit through greed in which Plaintiff has been significantly damaged.

**WHEREFORE**, Plaintiff respectfully pray that this Honorable Court grant him actual damages, punitive damages, and reasonable attorney fees and cost of suit.

## COUNT V
### *Intentional Infliction of Emotional Distress*
*Against All Defendants*

148.    Plaintiff re-states and incorporates the following sections herein: Jurisdiction, Parties, and Factual Allegations.

149.    The Defendants conduct in developing and acting out the enterprise purely for greed at the immense detriment of borrowers and investors, without any disregard to not only the destruction the effect of the enterprise had on the borrower, but on the trust investors collectively, and the destruction of communities and the U.S. economy, was reckless, extreme, and outrageous.

150.    Defendants conduct was willful and knowing.

151.    Plaintiff was not alerted of the Defendants' unlawful conduct until August 31, 2017 when a Forensic Report by CFLA revealed this unlawful conduct to the Plaintiff.  As a result of the Defendants conduct, Plaintiff has endured severe emotional distress resulting in immense stress, anxiety, depression, inability to continue business operations and the loss of the Property, which has been detrimental.

**WHEREFORE**, Plaintiff respectfully pray this Honorable Court award him actual damages, punitive damages, and attorneys' fees and cost of suit.

## COUNT VI
### *Trespass*
*Against Aspen Shackleton and Gregory Funding*

152.    Plaintiff re-states and incorporates the following sections herein: Jurisdiction, Parties, and

Factual Allegations.

153.     In June 2017, prior to the sale of Plaintiff's home, Defendants Aspen Shackleton and

Gregory Funding trespassed through unauthorized presence and entry on Plaintiff's

property. Specifically, Defendants put up signs on Plaintiff's property and continuously

sought access to Plaintiff's home.

154.     As a result of Defendants' trespass, Plaintiff suffered damages.

**WHEREFORE**, Plaintiff respectfully pray this Honorable Court award him actual

damages, punitive damages, and attorneys' fees and cost of suit.


### COUNT VII
### *FDCPA*
*Against Aspen Shackleton and Gregory Funding*

155.     Plaintiff re-states and incorporates the following sections herein: Jurisdiction, Parties, and

Factual Allegations.

156.     The FDCPA provides a general prohibition against use of false, deceptive or misleading

collection tactics.  The Act provides a general prohibition against harassing, abusive

and/or oppressive conduct. 15 U.S.C. § 1692d. Collector can't publish lists of debtors or

advertise debts, including blacklisting.  15 U.S.C. § 1692d(3). A collector cannot make

any false, deceptive or misleading statements.  15 U.S.C. § 1692e, e(10).   Moreover, a

collector cannot falsely represent character, amount or legal status of debt.  15 U.S.C. §

1692e(2)(A).

157.     Defendants are debt collectors under the meaning of the FDCPA.

158.     The Defendants violated the FDCPA because they placed harassing phone calls to the

Plaintiff in 2017, and placed signs on Plaintiff's property thereby advertising that the

Plaintiff's home was in foreclosure.  The Defendants' phone representatives also falsely

told Plaintiff that a payoff statement would not be provided because the property was in foreclosure and there was no hope of saving it.

159.   As a result of Defendants' above conduct, Plaintiff suffered damages.

**WHEREFORE**, Plaintiff respectfully pray this Honorable Court award him actual damages, punitive damages, and attorneys' fees and cost of suit.

### COUNT VIII
### *RESPA*
*Against Aspen Shackleton and Gregory Funding*

160.   Plaintiff re-states and incorporates the following sections herein: Jurisdiction, Parties, and Factual Allegations.

161.   Effective January 10, 2014, the CFPB's Regulation "Title X" was promulgated pursuant to the Dodd–Frank Act and the 2013 Real Estate Settlement Procedures Act ("RESPA"). It delineates several procedures as conditions precedent to moving forward with a foreclosure action. For example, 12 C.F.R. § 1024.41[c] states, that if a borrower engages in loss mitigation, then, a servicer may not move for summary judgment, order of sale, or conduct a foreclosure sale. The Servicer is required to investigate in good faith and to render a decision on the loss mitigation before proceeding to foreclosure sale.

162.   In April 2017, Plaintiff submitted an offer to purchase the loan/property for $395,000. Defendants waited over a month, failed to investigate in good faith, and refused the offer without any explanation.  While the offer was pending, Defendants continued to proceed with the foreclosure in violated of RESPA.

163.   As a result, Plaintiff suffered substantial damages.

**WHEREFORE**, Plaintiff respectfully pray this Honorable Court award him actual damages, punitive damages, and attorneys' fees and cost of suit.

Dated: June 5, 2018                    Respectfully submitted,


                                       By their attorneys,

                                       s/David Rubenstein

                                       David Rubenstein
                                       RUBENSTEIN BUSINESS LAW
                                       30 S. Wacker Drive, 22nd Flr.
                                       Chicago, IL 60606
                                       Ph: 312-466-5612
                                       Fax: 312-466-5601